IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 97-30285

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee-Cross-Appellant,

versus

DONALD L BECKNER,

Defendant-Appellant-Cross-Appellee.

---

Appeals from the United States District Court
for the Middle District of Louisiana

---

February 2, 1998

Before WISDOM, HIGGINBOTHAM, and STEWART, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

The government here urges that a former United States Attorney, engaged to defend an SEC proceeding, joined his client's criminal enterprise. A jury convicted the attorney, Donald L. Beckner, for aiding and abetting his client's fraud. Beckner contends to us that the evidence was insufficient to demonstrate that he knowingly participated in any crime. We agree and reverse.

I.

In 1990, Sam Recile and his companion, V. Rae Phillips, began raising capital for Place Vendome, a shopping mall project in Baton Rouge, Louisiana. In 1991, Recile retained Donald Beckner to assist him in the Place Vendome project. At the time Beckner, a

former United States Attorney for the Middle District of Louisiana, was a prominent and well-regarded lawyer in private practice in Baton Rouge. The initial engagement was narrow: Beckner was to handle some problems Recile was having with the press.

However, in April 1991, the SEC initiated an enforcement proceeding against Recile, Phillips, and various related corporate entities. The SEC alleged that Recile was guilty of securities fraud in issuing mortgage notes from the Hannover Corporation of America, the "Hannover notes," to acquire capital for Place Vendome. According to the SEC, in distributing the notes, Recile lied to investors and provided them with worthless security. Recile engaged Beckner as his trial counsel in the SEC enforcement action. On April 12, 1991, a temporary restraining order was issued, enjoining Recile from soliciting funds for Place Vendome. Judge Livaudais of the Eastern District of Louisiana later modified the order to permit Recile to continue to develop the project, so long as he used only his own assets as security. On April 30, 1991, by consent, this court directive was continued as a Preliminary Injunction, and the district court appointed a Special Master to perform an accounting of the funds that Recile had raised to date.

The fact is that Recile was in trouble with the SEC when Beckner arrived on the scene. Nor was he the first lawyer there. Recile employed a variety of "in-house" attorneys who provided him with day-to-day assistance in commercial transactions. Recile was

also represented by lawyers in major law firms in Atlanta and Washington, D.C., specializing in securities law.

Beckner was trial counsel. He was not a confidant or everyday advisor to Recile. Specifically, Beckner disclaimed sophistication in matters of corporate finance and the intricacies of securities regulation, asking Recile to obtain that assistance from others. Aware of his own limitations, Beckner routinely sought guidance from the Atlanta and Washington lawyers on technical securities matters. It is also important to keep in mind that the gaps in Beckner's experience, that he disclosed, were not bridged by his two young associates, Glenn Constantino and Henry Olinde. They were newly minted lawyers with virtually no legal experience. As we will see, the two associates proved to be a major source of Beckner's difficulty as it was these two lawyers who cast suspicion upon their boss.

In July 1991, Constantino and Olinde became concerned about certain of Recile's financing practices. Recile had an interest in an office building and residence "compound" called Redwood Raevine. He employed "collateral mortgages" on Redwood Raevine as security for Place Vendome investors, pledging his interest in the property to back the Place Vendome notes. Constantino and Olinde, however, learned from an outside lawyer, Michael Uter, that there were problems with the collateral mortgages. According to Uter, the mortgages were not recorded, they had been pledged to multiple investors simultaneously, and they lacked sufficient equity to secure their obligations. In early July 1991, Constantino and

3

Olinde told Beckner about these complications. Following this meeting, Beckner's firm recorded the mortgages. It also drafted a Joint Collateral Pledge Agreement to rectify the multiple-pledgee problem. When Beckner turned to the sufficiency of the equity, he learned of an MAI appraisal, valuing Redwood Raevine at $2.5 million. By August 1991, Beckner had obtained a list of investors from Recile, indicating that Recile had only pledged $1.8 million against the property, well below the $2.5 million appraisal. This information eased Beckner's concerns about the property's equity.

In the meanwhile, Beckner moved on another front. He began to push his client. On June 23, 1991, Beckner expressed concern in a letter to Recile that a court might construe the notes Recile issued to borrow money to be a sale of a security, prohibited by the Preliminary Injunction. On July 10, 1991, Beckner wrote Recile a second letter. In this letter, Beckner specially instructed Recile to stop issuing "double-your-money-back" notes, notes that would almost certainly be considered securities, even if secured by mortgages on real property. This time, Beckner backed his instruction by threatening to withdraw from his representation of Recile if Recile did not cease this fundraising tactic. During this time when Beckner was increasing his demands upon Recile for lawful conduct, the SEC requested appointment of a receiver.

On July 16, 1991, Beckner filed a memorandum in the SEC litigation in opposition to the appointment of a receiver over Place Vendome. In the memorandum, Beckner argued that the securities laws did not apply to Recile's practice of issuing notes

4

secured by mortgages, thus depriving the SEC of jurisdiction. Beckner cited the fourth prong of a test for "securities" laid out by the Supreme Court in <u>Reves v. Ernst & Young</u>, 494 U.S. 56 (1990). In <u>Reves</u>, the Court stated that one criterion for determining whether an instrument is a security is whether there exists "another regulatory scheme significantly reduc[ing] the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." <u>Id.</u> at 67. Beckner argued in the opposition memorandum that "Louisiana law provides protection to parties involved in similar transactions (notes secured by mortgages). There is, thus, a body of law that significantly reduces the notes' attendant risks."

By August 1991 when Beckner acquired a list of the investors in the Place Vendome project, concerns raised by Constantino and Olinde had been met. Nonetheless, Constantino asked Beckner if he could approach the investors on the list and ask them what representations had been made to them by Recile. Beckner instructed Constantino not to do so.

In April 1992, Beckner responded to discovery requests made by the Special Master in the SEC litigation. Although he produced a variety of documents, Beckner filed objections to many of the requests, claiming that they exceeded the scope of the Special Master's authority. Beckner declined to produce other documents on the basis of his clients' Fifth Amendment privilege against self-incrimination. The Special Master never responded with motions to compel.

After the document production, events moved rapidly toward Beckner's withdrawal. The SEC complained that several important investors' files were missing. Beckner communicated this fact to Recile, who reacted by removing Beckner from supervision of the SEC litigation. Following a subsequent document production on June 4, 1992, the Special Master wrote to Beckner to confirm his understanding that all investor files had then been produced. At the same time, another event was unfolding that accelerated Beckner's eroding confidence in his client — the news reports regarding the Assignment of Proceeds.

The collateral mortgages on Redwood Raevine were not the only devices used by Recile to attract investors to Place Vendome. Later, Recile also began using an "Assignment of Proceeds" as a form of security for Place Vendome investors. The Assignment represented that the Place Vendome Corporation had obtained a $300 million loan, and it granted its holders a portion of the proceeds of that loan as security for their investment. In mid-1992, Recile gave Beckner a variety of documents, including sample notes backed by various incarnations of the Assignments of Proceeds. In early June 1992, a reporter contacted Recile to obtain information for a story he was writing about the Place Vendome financing. Recile asked Beckner to help him frame a statement on his behalf for the reporter. Recile's secretary transcribed Beckner's response. According to her written transcription, Beckner stated to Recile that the Hannover notes were not securities and Recile had not violated the Securities Act of 1933 in issuing them. On June 5,

1992, the reporter's story appeared in the newspaper and quoted Beckner as saying that notes secured by the Assignment of Proceeds were not securities and were legally proper. According to every witness of the conversation and the secretary's transcription of Beckner's statement, Beckner had said no such thing. Following the publication of the newspaper article, Beckner promptly wrote a letter to Recile, complaining that he had been misquoted. Beckner stated in the letter that he had meant to defend only the Hannover notes, not any notes backed by an Assignment of Proceeds.

On June 16, 1992, the SEC filed a motion for summary judgment in its enforcement action, including allegations that documents had not been produced. Beckner apparently had enough and on June 22, 1992, he wrote to Recile to withdraw from his representation. This letter was the culmination of a series of written exchanges between Beckner and Recile, in which Beckner threatened to terminate his representation unless Recile reformed his business practices.

Unfortunately for his investors, Recile's fundraising tactics, although facially in compliance with the Preliminary Injunction, were in fact fraudulent. Recile had little equity in the Redwood Raevine property that he was employing as security, and what equity he did possess was pledged to multiple investors simultaneously. Moreover, Recile never obtained the $300 million loan that supposedly backed the Assignment of Proceeds. Recile's investors lost approximately $6 million to his scheme. Both Recile and Phillips eventually pleaded guilty to separate indictments stemming from their involvement in the Place Vendome project.

During a resulting grand jury investigation and a few months after Beckner withdrew from Recile's representation, Constantino and Olinde became apprehensive over their possible implication in wrongdoing and consulted a local criminal lawyer. They then contacted the FBI and the local U.S. Attorney's office. The young lawyers claimed that Beckner had been intentionally withholding critical documents from the grand jury investigating Recile. Constantino and Olinde's allegations regarding these documents at trial were shown to be based on highly dubious circumstances. Olinde alleged that he spotted timesheets relevant to the grand jury investigation in Beckner's trash can while working in Beckner's office one Sunday morning. Yet Olinde had no reason to be in the office that day; Beckner's trash can was typically positioned in a place outside of Olinde's view; Olinde changed his story about the exact day he stumbled across the timesheets; and Olinde's and Constantino's, but not Beckner's, fingerprints appeared on the timesheets, in a way suggesting that the two had crumpled the papers themselves. The jury ultimately acquitted Beckner of obstructing justice and perjury before the grand jury, but the damage at the grand jury stage was done. In July 1993, a grand jury returned an indictment against Beckner, accusing him both of withholding documents from the government and directly aiding and abetting Recile's fraud. Despite the number of attorneys representing Recile, Beckner was the only lawyer indicted for participating in the Place Vendome project.

The indictment charged Beckner with four counts of aiding and abetting wire fraud, one count of obstruction of justice, and one court of perjury. The aiding and abetting counts were based on four factual predicates: 1) That, to conceal Recile's fraud, Beckner made a misrepresentation about the Place Vendome notes in his memorandum opposing the appointment of a receiver; 2) that Beckner prevented his associates from informing investors about Recile's fraud; 3) that Beckner hindered the production of documents to the SEC to prevent the appointment of a receiver and perpetuate the fraud; and 4) that Beckner misrepresented in the newspaper article that the Assignment of Proceeds was legally proper, again to prolong the fraud.[1] The obstruction of justice

---

[1]Specifically, the indictment alleged:
Beckner's aiding and abetting of the scheme and artifice included the following acts:

    a)    BECKNER falsely represented to others that Louisiana law provided protection to lenders holding notes and mortgages which had been provided to them by promoters of Place Vendome. In fact, Beckner knew of deficiencies in the mortgage documents and material omissions of fact in representations to lenders to whom these mortgages were being given to secure the loans. Because of the knowledge BECKNER had, his representations were knowingly deceptive.

    b)    BECKNER instructed an attorney in his employ not to contact persons who were lending money to Place Vendome's promoters. By Beckner's doing so, such persons were not informed of the true nature of their loan transactions. This conduct on Beckner's part caused victims of the ongoing scheme and artifice not to receive disclosures that could have prevented the deception.

    c)    BECKNER hindered the production of documents in a federal civil proceedings to determine whether the Place Vendome project should be placed under the control of a court-appointed Receiver. BECKNER knew that production of these records would have revealed a pattern of deception in the offering of collateral by Place Vendome's

and perjury charges were premised on Beckner's alleged withholding of information from the grand jury.

The case first went to trial in February 1994, but the jury deadlocked, and the court declared a mistrial.  At his second trial in July 1994, Beckner was convicted on the wire fraud and perjury counts, but acquitted on the obstruction of justice charge.  However, after finding that the trial judge mishandled the issue of pretrial publicity during voir dire, we overturned Beckner's convictions.  See United States v. Beckner, 69 F.3d 1290 (5th Cir. 1995).  In August 1996, Beckner went on trial for a third time and was convicted on the aiding and abetting counts alone.

Beckner timely appealed from the judgment entered following the third trial, arguing that the evidence was insufficient to support his conviction and that the district court ordered an excessive amount of restitution.  The government, on the other hand, cross-appealed, challenging the downward departure from the Guidelines taken by the district court in calculating Beckner's sentence.

### III.

In attacking his conviction on sufficiency of the evidence grounds, Beckner faces a heavy burden.  Our review of the sufficiency of the evidence supporting a conviction requires us to

---

promoters.
d) BECKNER represented to others that notes secured by an "Assignment Of Proceeds" were legally proper.  In fact, Beckner knew that the "$300,000,000.00 Collateral Mortgage Loan" referenced in the Assignment Of Proceeds had not been obtained.  Because of the knowledge BECKNER had, his representations were knowingly deceptive.

determine whether a reasonable jury could find that the evidence establishes the guilt of the defendant beyond a reasonable doubt. See United States v. Pennington, 20 F.3d 593, 597 (5th Cir. 1994). In doing so, we review the evidence in the light most favorable to the government, drawing all reasonable inferences in favor of the prosecution. See id. Moreover, when an indictment charges several acts in the conjunctive, the verdict must stand if the evidence is sufficient with respect to any one of the acts charged. See Turner v. United States, 396 U.S. 398, 420 (1970). Thus, if we find that the evidence is adequate on any one of the four predicate acts underlying Beckner's aiding and abetting counts, his appeal must fail.

Although Beckner must defeat each of the four separate allegations in the indictment, one factual issue dominates this appeal: whether Beckner had knowledge of Recile's fraud. In charging Beckner with aiding and abetting Recile's crimes, the prosecution had to show that Beckner acted with criminal intent. See United States v. Murray, 988 F.2d 518, 522 (5th Cir. 1993) ("The essence of aiding and abetting is a 'community of unlawful intent' between the aided and abettor and the principal. Although the aider and abettor need not know the means by which the crime will be carried out, he must share in the requisite intent.") (citations omitted). Whether Beckner possessed such intent depends upon whether he had knowledge of ongoing criminal activity engaged in by Recile while Beckner represented him. If he possessed such knowledge, then Beckner's legal efforts on behalf of

11

his client can reasonably be interpreted as an attempt to aid and abet Recile's fraud.  On the other hand, if Beckner lacked knowledge of Recile's criminal activities, then Beckner did nothing more than discharge properly his duties as an attorney, even if his legal services may have unwittingly assisted Recile in his misconduct.[2]

We find that the government offered insufficient evidence to demonstrate Beckner's knowledge of Recile's fraud.  The government presented no direct proof of Beckner's knowledge.  Instead, it relied on circumstantial evidence.  Of course, the government may prove a guilty mind circumstantially; oftentimes it is impossible to demonstrate knowledge in any other way.  "But the use of circumstantial evidence does not relieve the government of its burden of establishing [elements of an offense] 'beyond a mere likelihood or probability,' or by more than mere speculation." United States v. Massey, 827 F.2d 995, 999 (5th Cir. 1987)) (citations omitted).  We conclude that the circumstantial evidence here did not permit the jury to draw a reasonable inference of guilty knowledge; rather, the government's evidence invited only speculation and conjecture.

---

[2]In representing Recile in the SEC enforcement action, Beckner was of course aware that the SEC disapproved of some of Recile's fundraising activities.  The Preliminary Injunction, however, permitted Recile to continue to seek financing for Place Vendome, so long as that financing was secured by Recile's own assets. Thus, Beckner's awareness that Recile was continuing to issue notes backed by his Redwood Raevine property does not in and of itself support an inference that Beckner knew that Recile was engaging in fraud.

Beckner's July 1991 confrontation with his associates Olinde and Constantino regarding the collateral mortgages is central to the prosecution's efforts to pin knowledge on Beckner. The government contends that Constantino and Olinde gave Beckner information that would lead a reasonable person to believe that fraud was occurring. We disagree. Constantino and Olinde repeated to Beckner the opinion of Uter that Recile lacked sufficient equity in Redwood Raevine to cover the multiple security obligations on the property. According to the government's view of the evidence, Uter's statement gave Beckner knowledge of Recile's fraud. Yet there was uncontradicted testimony at trial that shortly after his confrontation with Olinde and Constantino, Beckner received an MAI appraisal valuing Redwood Raevine at $2.5 million. Recile's lawyers told Beckner that Recile's debt on the property amounted only to about $300,000. Nothing suggests the unreasonableness of Beckner's belief that Recile had over $2 million in equity in Redwood Raevine. Moreover, a few weeks after receiving the MAI appraisal, Beckner obtained an investor's list from Recile, indicating that Recile had pledged Redwood Raevine to secure a total of just $1.8 million in notes.

In the end, these rosy financial pictures proved to be incorrect; Recile in fact had little equity in the Redwood Raevine property. The only evidence the government offered to establish Beckner's knowledge of this fact, however, was Uter's professed concerns about Recile's equity, relayed to Beckner by Constantino and Olinde. Yet Beckner responded. He inquired and obtained hard

13

financial data contradicting Uter's opinion. The government produced no evidence demonstrating that Beckner should have disbelieved this data; accordingly, a jury could not reasonably infer Beckner's criminal knowledge from this evidence alone.

The other evidence offered by the government to prove Beckner's knowledge of Recile's crimes, however, was even flimsier. The government contends that Beckner's July 10 letter to Recile evinces Beckner's awareness of Recile's crimes, as it instructs Recile to stop his fundraising practices. Yet the letter only advises Recile to cease issuing "double-your-money-back" notes, as doing so would violate the terms of the Preliminary Injunction. The letter in no way acknowledges that Recile's other fundraising activities were somehow fraudulent. The government also posits that Beckner's receipt of his legal fees directly from the funds of investors reveals his knowledge of the fraud. While it may be unconventional to receive fees in this manner, we fail to understand how Beckner's payment from the investors' funds can in any way establish knowledge of Recile fraud.

Lastly, the government argues that Beckner knew of the fraud because he lied to an FBI agent assigned to the case, telling her that he had nothing to do with the Redwood Raevine mortgages. Beckner played no role in drafting and issuing the Redwood Raevine mortgages; he only defended their propriety to the SEC post hoc. Perhaps Beckner should have explained that he was defending an SEC proceeding in which the Redwood Raevine mortgage notes were in play, but the rub for the government is that Beckner could not have

been denying this connection to the mortgages. Long before the FBI interview, the government was well aware that Beckner was defense counsel in the Place Vendome SEC action.

In short, the government failed to produce evidence establishing that Beckner was aware Recile was engaged in a fraudulent activity and knowingly worked to further it. The jury was left in considering Beckner's criminal intent with little more than his status as Recile's lawyer. That Recile closely controlled the flow of information to Beckner and routinely lied to him was uncontradicted in the evidence. The jury was essentially asked to assume that as Recile's lawyer, Beckner must have had knowledge that Recile was cheating. With the paucity of evidence of knowledge, the deliberate blindness instruction that the trial court gave to the jury only fuels speculation. For an attorney to be convicted for aiding and abetting a client's fraud, that attorney must have had actual knowledge of the fraud and must have taken an active role in advancing the wrongdoing. Cf. United States v. Connery, 867 F.2d 929 (6th Cir. 1989) (holding an attorney criminally liable when he intimately and knowingly participated in his client's filing of a false bankruptcy claim); United States v. Vaughn, 797 F.2d 1485 (9th Cir. 1986) (upholding conviction of an attorney who prepared documents to obtain an airplane for his clients, knowing that they intended to use it to import narcotics); United States v. Enstam, 622 F.2d 857 (5th Cir. 1980) (upholding conviction of an attorney for helping his client to establish a dummy corporation, knowing that it would be used to

15

conceal drug income from the I.R.S.), <u>cert. denied</u>, 450 U.S. 912 (1981).  Of course, where an attorney has an intimate association with his client's activities, a jury may reasonably infer that the attorney had knowledge of their illegal nature, even absent direct evidence to that effect.  <u>See, e.g.</u>, <u>United States v. Brown</u>, 943 F.2d 1246, 1251-52 (10th Cir. 1991) (permitting inference of criminal knowledge where an attorney was heavily involved in client's embezzlement scheme);  <u>United States v. Serrano</u>, 870 F.2d 1, 11 (1st Cir. 1989) (inferring criminal knowledge where an attorney "had his foot in all the elements of the transactions that led to the fraud[]");  <u>Wallace v. United States</u>, 281 F.2d 656, 659-60 (4th Cir. 1960) (inferring knowledge of client's tax fraud where an attorney could not possibly have performed his job without having investigated his client's books).

This situation is different.  Beckner was Recile's outside trial counsel — his stand-up lawyer.  Recile tightly restricted the flow of information to Beckner, Beckner had nothing to do with drafting and issuing the fraudulent notes, Beckner undertook his representation of Recile only after the SEC began investigating Recile's activities with able securities lawyers at his elbow, and Beckner took reasonable steps to correct the problems that he discovered in Recile's financing.  The jury could conclude that Recile was committing a crime, but it could not reasonably conclude that Beckner knew about it.  Beckner's representation of Recile only unwittingly, but not knowingly, promoted Recile's fraud.  To

16

convict Beckner on this basis is to make him a criminal for being a lawyer.

Without evidence of Beckner's guilty knowledge, the indictment crumbles. The predicate acts charged in the indictment amount to nothing more than routine legal services. First, the indictment alleged that Beckner was deceptive in arguing in the memorandum opposing the appointment of a receiver that Louisiana law protected investors who received the Hannover notes. Yet Beckner's argument in the SEC litigation was nothing more than a correct statement of the law, asserted to defend what Beckner believed to be his client's legitimate interests.

Second, the indictment accused Beckner of failing to contact investors once he learned of the problems with the collateral mortgage instruments, thereby contributing to the deception of the investors by Recile. Yet under the evidence, Beckner acted promptly to correct all problems with the mortgages of which he had knowledge. If Beckner had no knowledge of a crime, his ethical obligations as an attorney required him not to inform third parties about information relating to the representation of his client. See Rule 1.6 of the Rules of Professional Conduct for Louisiana. This cannot be turned over to a contention that not making the contact is evidence that Beckner had the requisite knowledge.

Third, the government alleged that Beckner hindered the production of documents to the SEC during discovery, thus prolonging the fraud. Again, without knowledge of the fraud, Beckner's objections to discovery requests amounted only to zealous

17

advocacy, not criminal conduct. Although the SEC at one point complained that Recile had not turned over all of the requested, non-privileged information, the fault for that omission lies with Recile himself, not with Beckner.

Finally, the government charged that Beckner represented to others, through the newspaper article, that the notes backed by the Assignment of Proceeds were legally proper. As we have detailed, the evidence was overwhelming that Beckner was misquoted by Recile's office or by the newspaper. According to the evidence, Beckner referred only to the Hannover notes, which he had no reason to believe were fraudulent. And that misquote was part of the cascading events leading to Beckner's withdrawal.

Attorneys are not outside the normal reach of the criminal law. See United States v. Cavin, 39 F.3d 1299, 1308 (5th Cir. 1994) ("At attorney is not above the law; like everyone else, he may not assist in the perpetration of a criminal offense."). That said, lawyers at the least are due its protection. The government did not prove that Beckner had knowledge of criminal wrongdoing. Beckner was hired to be Recile's trial lawyer, and in representing Recile he did what trial counsel is supposed to do. Without more substantial evidence of Beckner's criminal intent, we cannot agree that Beckner was a corrupt attorney, complicit in his client's crimes. A reasonable juror could not find the requisite intent on this evidence without speculating. Beckner may have exercised poor judgment and he may have been overly combative in fighting the SEC

18

proceedings.  But it is a large step from there to joining a criminal conspiracy.

IV.

Finding that the government offered insufficient evidence of Beckner's guilt, we REVERSE his conviction.  We do not reach the sentencing issues presented by the appeal and cross-appeal.

REVERSED.